s Yes. Mhm. Mm. Is the appellant? Ready to proceed? You may. Mhm. May it please the court opposing counsel. Good afternoon, everyone. My name is Kevin Global Tans represent my client. Her name is Caitlin McLean, and this is an appeal from an employment discrimination or race discrimination, political activities, discrimination and First Amendment retaliation case. Ultimately, the Middle District of Louisiana dismissed my client's complaint at the 12 B stage for various reasons. Uh, ultimately boiled down. I would like this court to reverse dismiss from my client's case for the same reason that on a rule 12 B, this court very often reverses dismissals, which is under the law. If there is any way to construe the well pled allegations of the complaint to find either jurisdiction or a viable cause of action, then the court is obliged to do so and to move the case along to litigation, discovery and either trial or motion for somebody judgment. And the alternative with respect to the subject matter jurisdiction issue that I'll brief first, to the extent that this court believes that there is some bona fide question about subject matter jurisdiction. I would ask this court reverse and remain with instructions to permit reasonable, limited discovery on the jurisdictional issue based on the overwhelming suggestion in the complaint that there is capacity to be sued for the defendant. There is subject matter jurisdiction. I'd like to address the jurisdiction argument first. The issue in the case is a fascinating one. Can an employee of a Louisiana Judicial District or Louisiana Judicial District Court sue her employer for employment based torts that they commit against her under Title seven in Louisiana state law? The answer to that question from a jurisdictional perspective has to be yes. And the reason is almost self-evident. When we ask the question, does an entity possess capacity to sue or be sued, we're asking whether or not the entity has the power to take legal actions on its own behalf. Under Louisiana state law, not a controversial statement, employment and the employment relationship is a relationship of contract. It is a contract. And to the extent that my client has alleged, and I don't think there's any real dispute, that her employer was the judicial district or the judicial district court, depending on which side you ask, then that entity is already engaging in legal activity. That entity already has the capacity to engage in legal activity. And all we're saying is that in the realm of employment, which they've already made a contract with my client for her employment, that they be held liable. Under Louisiana state law, under the Louisiana employment discrimination law, under the Louisiana employment or the political discrimination statute, which is briefed, that statute makes clear that any employer, including a political subdivision, is liable under that statute to be sued for employment torts. The issue here, I think, is this idea that somehow the judicial district did not actually employ my client, that somehow some other entity that exists out there employed my client. I would say, I would direct the court to our well-plaid allegation, which is that the entity that held itself out as the 21st Judicial District Court sat down, composed what they called a 21st Judicial District Court Employment and Policy Manual, gave it to my client, gave it to all of their employees, and the first page says you are now, congratulations, you're now an employee of the 21st Judicial District Court. It provided the employment policies for her employment. It provided her pay benefits and said that she would get vacation benefits. And then, and this is again cited in the complaint, it directed her that if she believed that she was the victim of illegal discrimination, it referred her to either the EEOC or the Louisiana Commission on Human Rights. And after she believed that she had been terminated because of illegal discrimination, that's exactly what she did. She went to the EEOC. At no point did any entity other than the 21st Judicial District Court hold itself out as... She got a right to sue letter from the EEOC. Yes, sir. Did the EEOC make a finding that there was cause to believe that there was discrimination? I think that we got a, well, we either got a no cause determination or we got a determination because we asked for the right to sue early because we didn't think... I tried to... I didn't see it in the papers and I may have overlooked it. I typically don't attach the right to sue letter to the complaint. We allege in the complaint the charge number that we received and that we timely filed. But, Your Honor, they did not issue a cause determination. But, just to, you know, for good lawyering, the EEOC, and I'm an employment discrimination lawyer by trade, it is extraordinarily rare that you would ever get a cause determination. The EEOC never issues a letter that says you are not discriminated against. They'll issue what's called a no cause determination. You don't have to go... I'm pretty familiar with EEOC letters. That's why I asked you whether or not you got one that said there was a finding that there was cause to believe that you were discriminated against. Yes, sir. If you didn't, you didn't. Let me just say this. If you got one of those, you'd be able to tell me, yes, that's what I got because you'd remember getting a letter like that. You just told me how rare it is. I did not get a cause determination. I know that for a fact. All right, that's fine. You may proceed. Thank you, sir. Moving on, we talk a lot about in the briefing about the Roberts style analysis, Roberts versus New Orleans Sewage and Water Board. That's the threshold case in Louisiana law to determine whether or not a judicial, a political subdivision has the capacity to be sued. I would like to direct the Court's attention to what I believe is one of the most important pieces of law in the case, which we briefed in the reply brief, and it's Louisiana Civil Code Article 24. Civil Code Article 24 says that all public entities have dual personality. There is the public personality when they were acting in their sovereign capacity, and they have private capacity when they were acting in their own private interests. There are many cases in Louisiana federal district courts that purport to say that a judicial district or a judicial district court does not have the capacity to be sued, but with the exception of one, the Griffith case, which supports my position, those cases were all decided in the context of trying to sue the court or sue a judge because a prisoner or someone like that was aggrieved by the public adjudication of a case that the court took. I am not saying anything in this case, I have not said anything in this case, and I will not say anything in this case that suggests to this court or anybody else that those were wrongly decided because I do believe that when, that you cannot sue a public entity for their public sovereign acts, just like the United States Supreme Court held in the Forrester case, that a judge does not have absolute judicial immunity for an employment discrimination claim. All I'm saying is that when a public entity, in this case a judicial district, is acting privately in a matter of contract or employment, and they're taking that upon themselves, and they breach those agreements or they commit employment torts, that they are liable under Louisiana law, whether it's a Roberts style analysis or under Louisiana substantive employment law, for those own particular acts. And the one case that got close to analyzing this issue was the Griffith case, and that was Judge Zaney in the Eastern District, and they, the plaintiffs sued the Orleans Parish Juvenile Court for an employment matter, and Judge Zaney wrestled with that same question, and he ultimately decided that Title VII would find a defendant because it was remedial in nature, and he allowed the suit to go forward. No case that I'm aware of in Louisiana state court has ever opined on this issue. I think that the court would have taken eerie guess, but I think that based on all of the law that we have briefed, the only consistent conclusion is that when a entity takes on the mantle of employer, they have to at least be held liable for their employment torts. I'd like to talk about the discrimination claim, the race discrimination claim, against both the 21st J.D. and retired Judge Morrison. The challenge to this claim was that it was not well pled. I think that even my friend on the other aisle in their appellate briefing has conceded that in the Fifth Circuit, in this court, that you do not have to plead a prima facie case to survive a Motion 12b-6, that you only must plead the ultimate elements of a Title VII claim, which is that there was an adverse action based on a protected status. Certainly, we've been over bad work backwards in our 20 or 30 page complaint to do that. I think the focus of the case across the aisle is that they take umbrage with the idea that there's enough evidence or allegation right now to make out a race discrimination case. All I can say, Your Honors, is that my client alleged every stitch of information that she had from her own eyewitness observations, which was the who, what, when, and why. Judge Morrison brought her into his chambers. Judge Morrison said, I am going to fire you. He said, and this is because of her public Facebook post, he said, in today's world we live in, you have to watch what you say and do. I have no choice but to fire you. The judicial administrator just said that she hated this decision, but her hands were tied. And my client, Ms. McLynn, was there. She understood the context. She heard the tone. She observed Judge Morrison. And she makes the allegation that based on everything that she could observe, what he meant when he said, you have to be careful with what you say and do, is in the context of the George Floyd protests, the George Floyd's murder, her making a political statement on Facebook that lampooned and satirized protesters, the fact that she, that her black or African-American colleague was the one that reported the post, and that she herself was a 23-year-old white woman, and that Judge Morrison was explaining the subtext of, a white person in your circumstance, I'm gonna fire that person when a black employee complains. Today, at this point in time, because of the protests. Okay, is my client wrong? Maybe she's wrong. Did Judge Morrison actually illegally fire her because of a race? We haven't had discovery yet. But she's entitled to make that good faith allegation based on what she heard and what he said. And it's not appropriate under Fifth Circuit precedent to dismiss that claim at this point in the case. After summary judgment, after Judge Morrison testifies, after we treat this case like every other case, a Title VII case, sure, everybody's gonna have their say. But not on a Rule 12b-6. Finally, I'd like to discuss the political discriminator, I'm sorry, the First Amendment claim, which is relevant, I think, to the discrimination claim. In this court, based on this court's precedent, which is cited in the brief, to have a First Amendment retaliation claim as a public employee, you have to satisfy four elements. Judge Jackson conceded and did find that she satisfied three out of the four elements. The fourth element, which is under discussion here today, is whether or not her interest in making the speech that she made outweighed her employer's interest in operational efficiency, preserving its ability to do its job, and whatnot. That's not a trivial issue. I grant that. But on a Rule 12b-6, the law in our circuit is clear that the court must make its determination based upon the well-pleaded facts of the complaint. And in the complaint, my client alleged that the post was six months old, that it had never caused any disturbance, that no one had ever found out about it, that it did not impede operational efficiency, that there was no possibility that it could have affected anything having to do with the courtroom or the courthouse. And in fact, Judge Jackson made findings of fact that were outside the four corners of the complaint. The district court found that, and this is in his opinion, that her post was designed to optimize outrage, that it actually did decrease public confidence in the court, that it was liable to impede the efficiency of the court. Maybe in discovery we'll find out that's true. But we don't know it's true now. There's no evidence that it's true now. And in fact, the allegations to the complaint are the exact opposite. And that's why I said at the beginning, our arguments really are couched in Rule 12. All of these things can be worked out. There's a process for working on all these questions. But under Rule 12, under the allegations of this case, it was not proper for the district court to dismiss my client's complaint based on observations or inferences that were not in the record. And I would say that to respond to the defendant filed a 28-J letter. It's about that Sixth Circuit case, Marquette. I do want to speak about that case, and this dovetails here. Marquette is so distinguishable from my case, it's really a plaintiff case. The Marquette case is how the Sixth Circuit decided a First Amendment retaliation case. It's an ugly, terrible case. After Tamir Rice was murdered and an EMS captain went on Facebook and lobbied racial slurs at Tamir Rice and said, I wish that I had actually killed Tamir Rice, and so on and so forth. Disgusting. Even in that case, the Sixth Circuit said, I'm going to mispronounce it, that the Solomonic wane of interest was so difficult to resolve that case. Because even in the ugliest way that a person could discuss another human being, they still had that First Amendment protected right. And in fact, in that case, the reason why it's so distinguishable from this case is that originally, the Sixth Circuit reversed dismissal of that case and made it come back on summary judgment after they had taken discovery. And the biggest difference between that case and my case is that the employer gave testimony in that case saying that, in fact, it was outrageous, the negative consequences that befell the city because of that statement. That there were mass protests because of the statement. It became a national news story. The NAACP protested that people were complaining, actual employees were complaining that they believed that they were unsafe because of what was going on. That was the actual record evidence that the Sixth Circuit used to say that the employer's burden to actually outweigh the First Amendment. Here, none of that exists. There's been no testimony. They could have, and my opponent, they could have converted this to a Rule 56. They could have supplied an affidavit from Judge Morrison. They could have introduced testimony on a Rule 56. They chose not to do that. They chose to come here on a Rule 12, and on a Rule 12, you have to take the complaint as you find it. It was not proper to dismiss based on reasons that were not in the Sixth Circuit. I'll answer them. If not, I'll wait until rebuttal. Thank you. Thank you, counsel. May it please the court. Good afternoon. I'd like to make three points this afternoon in my time. The first is the 21st Judicial District is not a party with procedural capacity, was not an entity that could be sued. Second, retired Chief Judge Morrison was not liable under Section 1983 for race discrimination. The plaintiff's complaint was hollow and conclusory, and the judge enjoyed qualified immunity in any event. And third, the plaintiff's First Amendment claim failed. She did not have a constitutional right to threaten civil rights protesters with physical harm, and in any case, Judge Morrison enjoyed qualified immunity because that right was not clearly established. Let me begin with the entity. The plaintiff was very deliberate about suing the 21st Judicial District. She did not sue the district court, and when we followed our Rule 12 motion, we expressed some puzzlement about exactly whom she intended to sue, and she said there was no mistake. That's page two of her opposition at Record 166. She meant to say that sometimes a district in law refers to a political subdivision. Not always. Sometimes it does. In this case, it did not. She now asks in a footnote in her reply brief, Well, if you don't think it's the district, send me back and now I will sue the court. Well, that's waived. This court said in Procter and Gamble versus Amway, asking for new relief in a reply brief is untimely. It's got to be in the opening brief. There was no request for a try again and to sue the court. As I'll explain, suing the court wouldn't have changed anything, but still it was not the defendant in this case. Now, much of the plaintiff's argument assumes when you say wouldn't change anything, you mean the outcome in this case? Exactly. It would be the same because the court is not an entity. The 21st Judicial District Court is not a political subdivision. Yet the plaintiff's argument basically starts on second base. She said it is the employer. It is the political subdivision. It is an entity, and that is simply incorrect. It is a boundary. The 21st Judicial District is those judges within three parishes in Louisiana. It's like a congressional district. It's like a council district. This Constitution says that the state courts shall be divided into districts and the legislature drew the lines. And in the statute, the plaintiff cites, says the 21st Judicial District shall be composed of three parishes. It does not create an entity, and that is contrasting with districts by law that are given personhood. The plaintiff raises fire protection districts in her brief, page 35. Under Title 40 of Louisiana law, they are public corporations with the right to We have nothing like that here. The Louisiana Stadium and Exhibition District is another district in law. It has the power to sue and be sued to own property and operate facilities. And even the sewage and water board in the Roberts case that our opponent brings up had, in the language of that case, virtual plenary legal authority to manage, direct and control all aspects and operations of a public utility system. And so, for reasons like these, several courts have held that Louisiana district courts are not proper defendants. Even Judge Zaney in the Griffith case, Judge Zaney sort of threw up his hands and said, Well, it's got to be someone. It's the state in some capacity. It's either the state estate, the state, um, with the through the en banc judges or the Orleans Parish Juvenile Court as an agency of the state. But our plaintiff did not sue any of those parties, and our plaintiff insists the state has nothing to do with it, that the district is a political subdivision. Admittedly, it's sort of confusing the way that Louisiana funds its courts. Parish clerks of court collect filing fees. They're obligated to put those fees into a special account, and the en banc judges of a particular district are the ones who spend the money. That's in Title 13. Interestingly, the law does not give the court the power to spend the money, does not give the district the power to spend the money. The en banc judges of the court. I want to move on now to the race discrimination claim. The plaintiff was an at will employee. We agree she had to plead the ultimate elements of her claim, and they weren't easy. She had to prove in this context that she was let go because she was white, not because of anything else. And yet there's no allegation of racial animus at all. In fact, it's perhaps the most apologetic termination known to man. When the judicial administrator said, I hate to have to do this, the chief judge said, I have no other choice. There was no racial animosity at all. And the court did not hold the plaintiff to any sort of elevated pleading burden. She was held to the same burden as everyone else, Iqbal and Twombly. And it's not enough to say that I want discovery in order to plead the facts. In other words, factual allegations are the price of admission to do discovery. That's the whole premise of Twombly. And yet the information and belief, and she poses a hypothetical. Had a person of a different race said this, I don't think that they would have been terminated. I think it's just because I said these words. Again, there was no factual content to make that plausible. She acknowledges the words that she spoke, and they're in the record, that she threatened to run over civil rights protesters in the wake of the George Floyd murder. And she referred to consider that a First Amendment law, a genuine threat. Under First Amendment law, we have a well-established body of jurisprudence that deal with threat as an almost a distinct category under the First Amendment. As I look at that, I can't say that that does not enjoy First Amendment privilege. One of the classic cases, you remember the case of the D.C. protest and the war protests, and this young 18-year-old boy was trying to get into the deal about protesting in Vietnam. And he said, well, give me that M1 rifle. And the first thing I learned about the sights are LBJ. Is that a threat to the President of the United States in that context? All I'm saying is that the First Amendment analysis of threat, I'm not hearing in this discussion. We assume this is a threat, and it's actionable. I started to... That jumps past a genuine First Amendment analysis as to whether this is a protective law. And, Your Honor, I appreciate the question. So the genuineness of the threat is unknown. It was a statement, though, that at a minimum was casually condoning violence that had happened in Oklahoma. I didn't phrase that quite right. It's obvious with this young lad is speaking in hyper-toned and protesting the war, and he's not going to have an opportunity to do this, etc., etc. She's talking about driving her horse trailer through that. I don't see this as bereft of First Amendment protection under a threat analysis. And, Your Honor, for today's purposes, we'll concede that it was a crude remark not intended to be serious, that she was not literally going to get behind the wheel of her car. But this court addressed something similar in the school context just two months ago in a case called McClelland. I believe it was in March of this year. And there, there was a threat of violence in jest, and the court upheld qualified immunity for a principal in that case who had suspended the football player who had made the threat in jest, and the court was very clear on that, and had used a racial epithet. Qualified immunity moves to a response to something that says, well, maybe there is an element of, there's still room under the threat analysis, obviously, for qualified immunity. You could answer that. You could protect the First Amendment rights by saying, well, there's no qualified, there's qualified immunity for the officer. And, Your Honor, just to finish up the race piece, we're talking about First Amendment, and it certainly seems, based on these allegations, that determination decision was because of words. It was because of the Facebook post. It was because of the reference to LPNs that a co-worker found offensive. But there's nothing in the complaint to lead us to believe that it was because of race. And so I'm focusing on this race claim in particular. It's implausible. And after Iqbal and Twombly merely saying, I don't think it would have been the same, you know, in other words, you're picking on me because I'm white, there's no facts here, especially given the overly apologetic nature of the decision. But even if there were some scintilla of racial element here, Judge Morrison would have qualified immunity. Because at a minimum, this would be a very unusual situation where someone is allegedly being terminated because they're white, but because of the words that they said. And so this combination of words and race, it would be a novel situation. This court has recognized that a 1983 race claim is subject to the defense of qualified immunity. And so that's another basis for Chief Judge Morrison would not be liable in his individual capacity on that claim. Now I want to move on now to the First Amendment claim and focus on a few areas of disagreement. The first one is that the plaintiff's insistence that Judge Morrison had to come forward with evidence of actual disruption, that he had to come to the court with affidavits or depositions showing that because of the words of the plaintiff spoke, employees were not getting along or whatever the case may be. And we fundamentally disagree with that. The standard here is a prediction of disruption. And the Supreme Court has said this in a case called Waters versus Churchill in 1994. The government's power as employer is greater than its power as sovereign. So as the sovereign of the people, as the lawgiver, the court might not be able to restrict certain speech. But as employer, its rights are greater. And so the Supreme Court said in that case, we have given substantial weight to the public concern. The McClellan case from two months ago is to the same effect. The suspension of the high school student happened the very next day after his Snapchat threat in jest. The very next day. There was no record in that case. It was a Rule 12 dismissal. And yet there was qualified immunity for the principal. Other cases from the Supreme Court have said that the government as employer has an interest in maintaining the appearance of impartiality. That's why the court upheld the Hatch Act and also the professionalism of its office in a case called City of San Diego versus Roe. Second, regarding qualified immunity in brief and somewhat today, our opponent seems to view that if she can cite a case for an abstract proposition here, government employees have free speech rights, then she has defeated qualified immunity. And that's not the case. The court said in Cunningham versus Kastlew that the analysis at a level of specificity and granularity. Pickering, of course, was a letter to the editor about school funding. We have something quite different here, whether this was a post on social media. Um, they, uh, noticed only because of a comment that she earlier had made that, uh, you know, a colleague that calls that colleague to go out and to, uh, locate to locate that. And I understood the argument that only it was only when they later found the post, it wasn't any disruption or any evidence of disruption at all. Post had been out there. And then this lady didn't want searching for it because of the exchange that she had had. Is that correct? We could see there's no evidence of disruption. This was a rule 12 motion. And so we took this on the face of the complaint and accepted everything they said is true. We don't need evidence of disruption. In fact, an argument that says that we need disruption would assume that speech claims like this can never be dismissed on rule 12. You'd always need some evidence. You'd always need at a minimum a motion for summary judgment. And that's simply not the case. This court has said so in Garza versus Escobar that the balancing and that's the real fight here, the balancing of the employer's interest versus the employee's interest. The balancing is a legal question for the court. So it's not a factual question at all. Again, Garza versus Escobar. And in a case like this, we need to look at the mission here. This is the judiciary. And this is someone associated with the Louisiana judiciary making remarks, again, whether meant to be serious or not, casually endorsing or condoning violence, making light of violence. People got hurt in Oklahoma. And Judge Morrison had a constitutional obligation to protect the reputation of the court for impartiality and integrity. In fact, as Judge Jackson noted, cases about protest methods have been filed all over the United States. They've been in this court, in Doe versus McKesson. And so I think it's important to focus on the governmental mission here. The judiciary, which I think we can fairly say is held to a higher standard. We have to also focus on the words. Again, this is very unusual language. This is I will run you over. And again, in combination with the mission, these words, clearly Judge Morrison would have qualified immunity, even if that were protected speech, even if the balance could be found to weigh in favor of a judiciary employee to be able to use language like that. There's no case that would put Judge Morrison on notice beyond debate that his hands were tied, and he had to just live with it. The Marquardt case that you cited in the 28 J letter. It is a Sixth Circuit case, and it is an E. M. S. Case, so it doesn't necessarily have anything to do with the judiciary along the lines of the argument that you just made. But they did allow the case to go to summary judgment. There was on summary judgment, Your Honor. But in the ruling, the court specifically said that it was looking not only at the evidence of disruption in that case, but they said when speech threatens to undermine the functions of organizations, and it talked about the city's interest in preventing the disintegration of public trust. Same thing in McClelland in the school case. And again, the plaintiff endorses this analogy to school cases. She she cites the school case. My Hanoi area school district in her first amended complaint. No need for evidence of disruption. That assumes that a chief judge of a court has to suffer the slings and arrows, have the court's reputation impugned and then try somehow to undo it. And given the fact that we've got this Pickering balancing test, part of the goal is to maintain the efficiency, not watch and see it disintegrate. So Judge Morrison again, he balanced correctly. But even if someone might quarrel with him after the fact, where is the case? It's not our burden decided, of course. Where is the case that the plaintiff would cite to say this type of termination for an employee who used that language beyond debate, you are violating her constitutional rights. We've not heard the case. The only case I've seen in brief was Pickering that was discussed at any length. Completely different. Again, it must be a level of specificity and granularity. Your Honor, just wrap up at this point. The plaintiff sued a non entity and deliberately sued a non entity, a district. She then forfeited the right to try to amend. Her race claim is hollow and implausible, using the phrase information and belief 49 times. And her free speech claim lacks any comparable case at a level of specificity and granularity. Chief Judge Morrison acted reasonably, and he's entitled to qualified immunity. We ask the court affirm. Thank you. Thank you, Counsel. Bottle. Is it a tough case? Your honor's? Yes. Tough case. Rule 12 exists so that tough cases can have their day in court. I did see the judicial district. I did see it on purpose. I think that that's the correct entity. I think it's the correct entity because Louisiana state law in a statute that we cited specifically says that when you're dealing with taxing issues, that political subdivision includes judicial districts. I sued the judicial district because you don't sue the fire station, you sue the fire district. You don't sue the hospital, you sue the hospital. What authority do you cite for the proposition that this is tantamount to a political subdivision or is a political subdivision? Well, aren't they typically creatures of statute, political subdivisions? Well, in at least one statute, 49303 subsection F, it does define a judicial district as a political subdivision. So that's that's Louisiana law on the books. Number two, under a Roberts analysis, the sewage and water board before the Louisiana Supreme Court said the sewage and water board could be sued as a, you know, because it's a separate juridical entity for purposes of workers comp. There was no statute that said the sewage and water board is a body politic of the state of Louisiana. That's, you know, we did a Roberts style analysis, Supreme Court said, that's what you are. And in fact, my opponent in his briefing admits that 49308 subsection F, this is on page 19 of their brief, for the limited purpose of the statute that we were discussing is a political subdivision. They said, but it shouldn't be a political subdivision in any other context. Well, okay. If we're admitting that sometimes something can be a political subdivision in one context, all I'm asking for is that it be a political subdivision in the context of employment. I do want to point out that at, and this is in our opening brief and in our, in our opening brief and at the district court and on reply, every single time I have said that, please, if this court decides it's outcome determinative, that it's the judicial district court and not the judicial district, please remand me on 19. I say that we have always tried to pursue the real party and interest for employee, regardless of whether the district court determined that the entity was the district court. And I'll reply to the same thing. And I asked to amend at the district court if that was outcome determinative as well. Just to wrap up, I have 45 seconds. In the Marquette case, and I don't disagree with this. Yes, obviously, an employer, if an employer reasonably predicts trouble, they don't have to wait for the trouble to get there. And that's what the Marquette case says as well. But the point is, it has to be a reasonable prediction based on the facts and circumstances of the day. And on a motion for summary judgment, we could have that discussion. On this Rule 12 motion, the facts and the circumstances of the day are the facts and circumstances that my client alleged in her complaint, and there's nothing else that we can determine, and, and the district court just made findings of facts that were outside the complaint. And that, on a procedural basis, is not permissible. Thank you so much. Thank you, counsel. The court will take this matter under advisement. That concludes the matters that are on today's docket for oral argument.